UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------X
WENDY CAROLINA CANALES HUETE

**VERIFIED
COMPLAINT**

PLAINTIFF,

No:    21-10767

-against-

**Jury Trial Demanded**

PRESIDENT CONTAINER GROUP II, LLC and
RICHARD GOLDBERG

DEFENDANTS.
-----------------------------------------------------------------------------X

PLAINTIFF, WENDY CAROLINA CANALES HUETE ("PLAINTIFF" or "MS.

HUETE"), by and through her undersigned counsel, PERVEZ & REHMAN, P.C., as for her

complaint against DEFENDANT PRESIDENT CONTAINER GROUP II, LLC ("PCG") and

RICHARD GOLDBERG ("MR. GOLDBERG") (collectively "DEFENDANTS") hereby

alleges as follows:

**PRELIMNARY STATEMENT**

1. This is a civil action for claims of sex-based discrimination, discrimination based on
national origin, retaliation and unlawful employment practices and to provide appropriate
relief to PLAINTIFF, who was adversely affected by these actions. The PLAINTIFF's
claims herein arise under Title VII of the Civil Rights Act of 1964, the New York State
Human Rights Law, N.Y. Exec. L. § 296 et seq., (hereinafter "New York State Human
Rights Law" or "NYSHRL"), Intentional Infliction of Emotional Distress, Sexual Assault,
Negligent Hiring and Supervision.

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over Title VII claims under 28 U.S.C. § 1331 and 1343 because they arise under the laws of the United States and are brought to recover damages for violations of civil rights.

3. This Court has supplemental subject matter jurisdiction over the State claims under 28 U.S.C. §1367 because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

4. Venue is proper in this judicial district under 28 U.S.C. §1392(b)-(c) and 42 U.S.C. §2000e-5(f)(3) because the Defendants conduct business and can be found in this district; a substantial part of the events and omission giving rise to the claims alleged herein occurred in this district; the alleged unlawful employment practices were committed here, and employment records relevant to the practice are maintained and administered here.

## ADMINISTRATIVE PREREQUISITES

5. The PLAINTIFF has satisfied all administrative prerequisites to commencing this action.

6. MS. HUETE filed her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 4, 2020.

7. The EEOC issued a right to sue letter for MS. HUETE dated October 5, 2021, which was received on October 5, 2021.

## PARTIES

8. At all times relevant to this action, MS. HUETE is a female who resided in Orange County, State of New York.

9.  At all times relevant to this action, DEFENDANT, PRESIDENT CONTAINER GROUP II, LLC, ("PCG" or 'CORPORATE DEFENDANT") is a domestic corporation engaged in business in State of New York with a principal place of business at 290 BALLARD ROAD, MIDDLETOWN, NY 10941

10. At all times relevant to this action, DEFENDANT, RICHARD GOLDBERG, ("MR. GOLDBERG" or "INDIVIDUAL DEFENDANT") is the President of PCG.

11. At all relevant times to this action, CORPORATE DEFENDANTS and INDIVIDUAL DEFENDANTS employed PLAINTIFF.

## FACTUAL ALLEGATIONS

### *Plaintiff's Employment*

12. At all relevant times herein, CORPORATE DEFENDANTS and INDIVIDUAL DEFENDANTS (collectively "DEFENDANTS") are employers within the meaning of all relevant statutes.

13. PLAINTIFF was employed by DEFENDANTS beginning on July 11, 2018. She was hired as a stacker and worked on the "Partition" machine.

14. PLAINTIFF's job duties included: gathering the materials/boxes that came out of the machines, organize and stack, and wrapping them with plastic. She would then make a report on the computer on how many boxes/units were completed and for which client.

15. PLAINTIFF worked on the floor of the warehouse with many other co-workers.

16. There were approximately twenty-five (25) or thirty (30) co-workers in her department.

17. There are over a hundred of employees who work in the warehouse.

18. Since PLAINTIFF began working at the Company, she had no issues or disciplinary action with respect to her work performance. She was a dedicated employee, strong

performer and was not disciplined until she complained of sexual harassment.

### *Relevant Individuals*

19. Angel Garcia ("Garcia") was a co-worker and stacker.

20. Hector Campos ("Campos") was also a co-worker, and he operated the forklift.

21. Rosendo Cuatle ("Rosendo") was her direct supervisor.

22. Mitzi Chavez ("Chavez") was also a co-worker and stacker, but she was a floater who worked multiple machines.

23. Adelfo Lopez ("Lopez") was also a co-worker and the operator of the Partitioner, the machine PLAINTIFF worked on.

24. Ever Guerrero ("Guerrero") was a co-worker and an operator of the Slitter machine "B".

25. Guillermo Azcatl Hidalgo ("Guillermo") was a co-worker and assistant to the Labor machine operator which was located next to the Partition machine. The computer which PLAINTIFF was to use was located there as well.

26. Mariebelle Fernandez ("Mariebelle") is the secretary for the Human Resource Department and the translator for those who only speak Spanish.

27. Andrew ("Andrew") is the Safety person who makes sure that the machines and warehouse are in safe condition and if there is an accident, he would investigate.

28. MR. GOLDBERG is the President of PCG. Upon information and belief, MR. GOLDBERG is also President of the Union.

### *Sexual Harassment*

29. Starting a few weeks after her initial employment with PCG, PLAINTIFF'S supervisor, Rosendo, asked PLAINTIFF out on a date on a number of occasions.

30. PLAINTIFF always told Rosendo that PLAINTIFF wanted to keep their relationship professional at work, but Rosendo was persistent.

31. Jesus Gill-Ramirez ("Ramirez") was employed by the Company before PLAINTIFF began her employment.   PLAINTIFF and Ramirez started dating in 2018 after PLAINTIFF started her employment with PCG.   However, they did not tell anyone about their relationship and kept it private.

32. When Rosendo kept asking her out and not listening when PLAINTIFF would say no, PLAINTIFF eventually told Rosendo that PLAINTIFF was already dating someone. PLAINTIFF did not tell him it was Ramirez, but Rosendo guessed it was someone in the Company.

33. In July 2019, a co-worker, Julio Pacheco ("Pacheco") learned that Ramirez and PLAINTIFF were dating and living together.

34. PLAINTIFF'S co-workers, especially Guillermo, would taunt PLAINTIFF and say that now she is living with Ramirez, she's going to get pregnant and have kids.   Guillermo would say this to PLAINTIFF on an almost daily basis; so much so that PLAINTIFF felt like she was starting to harass her about getting pregnant and having kids.

35. The work environment was one of constant bullying and inappropriate comments and jokes. Her co-workers always attempted to speak to her about personal matters.

36. On or about April 2020, PLAINTIFF went to the cafeteria to eat her lunch. On the table behind her, was Garcia.   PLAINTIFF heard Garcia spreading false rumors about her.  He was talking to other co-workers about her. PLAINTIFF heard him say "That bitch has AIDS and genital warts." These co-workers included Felix Ponce, Felix's brother, Garcia's son, and Pacheco's brother whose nickname is "King Kong."

37. PLAINTIFF was always nice and friendly with everyone so PLAINTIFF was very surprised that Garcia would say these comments and spread false rumors. Shortly before this incident, PLAINTIFF had given Garcia an occasional ride back home or to work when he needed transportation.

38. These rumors were very shocking, upsetting, harassing, and embarrassing.

39. The rumors spread like wildfire throughout the workplace.

40. None of her co-workers wanted to work or be around her because of the rumors.

41. Her co-workers and supervisors including Rosendo, Chavez, Garcia, Lopez, Campos, Guerrero, and Guillermo would swear at her.

42. They would say things like "fuck you" (in Spanish) and would stick their middle fingers up at her.

43. This happened on a daily basis, and they all worked in or around PLAINTIFF'S area on the warehouse floor.

44. Guillermo would attack her every time PLAINTIFF walked up to the computer. Guillermo would stand behind PLAINTIFF and stick up her middle finger or make a motion as if PLAINTIFF smelled. She would say to PLAINTIFF, "nasty girl," "herpes is coming," and other harassing comments. She would also make a symbol which in Mexico stands for "Fuck you."

45. Pacheco would hear this and ask them to stop but they did not listen. He was the only one that stood up for PLAINTIFF and asked other co-workers to stop their harassment and hostility.

46. PLAINTIFF was so scared to say anything and just tried to ignore them.

47. The workplace quickly became an environment which fostered hate and harassment. There was constant bullying, name calling and now, sexually inappropriate rumors which made the workplace very hostile.

48. The sexual harassment and hostile work environment were severe and pervasive.

49. PLAINTIFF felt like she had no one to complain to because even her supervisor, Rosendo, partook in the harassing behavior.

50. At times, PLAINTIFF was sent to another machine to work. Every time Rosendo walked past PLAINITFF, he would put up his middle finger or gesture that PLAINTIFF smelled. He also used the hand gesture referred to above, which means "fuck you".

51. Lopez, the Partitioner machine operator who worked with PLAINTIFF, would also make similar gestures to Chavez about PLAINTIFF.

52. Guerrero would put up his middle finger or gesture that PLAINTIFF smelled. He also used the hand gesture which means "fuck you" in Mexico. He would say (in Spanish) "She got herpes in her pussy." He would say it loud for everyone to hear and they would all laugh. Rosendo would laugh as well.

53. When Garcia would come to PLAINTIFF'S machine, he would make the same gestures.

54. When Campos would see PLAINTIFF, he would say "the Pussy is coming here again," The "fucker" and/or the "HIV is coming." He would say this in Spanish.

55. Also, shockingly and very frightening, someone said "if this bitch says anything about us, we have Rosendo to give us her address so we can kill her."

**Discrimination and Harassment Based on Her National Origin**

56. PLAINTIFF is from Honduras. Coincidentally, at the workplace a YouTube video began circulating. In this video, individuals from Honduras are discussing how Mexicans live

and how Mexican women are in a disparaging manner. PLAINTIFF'S co-workers were offended by this video and began attacking PLAINTIFF just because PLAINTIFF was from Honduras. PLAINTIFF had nothing to do with the video but just because the woman in the video was also from Honduras, co-workers used the video as another justification to harass and attack PLAINTIFF.

57. In a clear statement of discrimination based on national origin, Lopez said to PLAINTIFF that he did not want to work with people from Honduras and only those from Mexico. Most of PLAINTIFF'S co-workers, including her supervisor, are from Mexico.

58. This continued through June 2020; it was an emotionally difficult time for PLAINTIFF. It was months of abuse and PLAINTIFF did not understand what PLAINTIFF did wrong to deserve this.

59. PLAINTIFF was afraid that if PLAINTIFF did complain, her employer/co-workers would create an even more difficult work environment.

60. PLAINTIFF lost her appetite, had trouble sleeping, and suffered from depression and anxiety from the harassment.

**Her Personal Relationship**

61. Ramirez witnessed the constant harassment and hostile gestures directed at Plaintiff. He worked on the same floor and from his department, PLAINTIFF could see him.

62. He told PLAINTIFF that he saw this behavior and encouraged her to complain to Human Resources.

63. Ramirez believed that the co-workers, who were Mexican, were upset that Ramirez (who is also Mexican) was dating someone from Honduras.

64. Ramirez is an Operator of Machine 1628. His supervisor, Tim, told Ramirez that he did not know that PLAINTIFF was his girlfriend because most co-workers refer to PLAINTIFF as Ramirez' "wife."

65. Once when he went to the breakroom, he heard co-workers talking about PLAINTIFF. He heard Garcia saying in Spanish, "if this bitch complains Garcia will kill them. He has some people in the city who can do this job."

66. PLAINTIFF became extremely worried because she believed this individual was dangerous.

**Complaint to Human Resources**

67. On or about June 8, 2020, PLAINTIFF gathered the courage to complaint to Human Resources. PLAINTIFF spoke to Mariebelle .

68. PLAINTIFF told Mariebelle her complaints, and Mariebelle wrote everything down as PLAINTIFF'S Complaint. The complaints included: Rosendo asking her out on a date on a number of occasions, harassing her about her private dating life, discussing pregnancy and kids, spreading rumors that she has AIDS and genital warts, using derogatory language like referring to her as "bitch", gestures of "fuck you"- all on a consistent, daily basis.

69. PLAINTIFF was a member of Union 560. One of the Union shop stewards sat in on the meeting. His name was "David." "Brian" was also present at this meeting.

70. Both Mariebelle and David said they were going to investigate PLAINTIFF'S complaints.

71. Ramirez was coming back from the bathroom when some of the co-workers who were harassing PLAINTIFF were, upon information and belief, being interviewed. He heard them come down the stairs saying, "we won, we won" and "this bitch is out of here."

72. Despite PLAINTIFF'S complaints, Human Resources never called PLAINTIFF back to discuss her complaints or the outcome of their investigation. Neither did the Union.

73. The only action taken by Human Resources was that Mariebelle came to PLAINTIFF'S department and said there should be no bullying and directed all employees to respect everyone.    No corrective action was taken, no one took PLAINTIFF'S complaints seriously, and in fact, the situation got significantly worse.

74. Neither Human Resources nor the Union took action to stop the harmful spread of rumors, and constant harassment.

75. On or about June 30, 2020, PLAINTIFF filed another complaint that alleged, among other things, that her co-workers spread false rumors that she had HIV and genital warts. PCG did not initially and promptly investigate this second serious complaint. In fact, during a meeting with MR. GOLDBERG, PLAINTIFF raised her prior complaints and he seemed to be unaware and said an investigation would be conducted. Yet, there was no prompt investigation.

**Union**

76. Aside from going to Human Resources, PLAINTIFF attempted to complain through the Union multiple times but they did not respond to her complaint or file a grievance on her behalf.

77. PLAINTIFF left voicemails and messages.

78. In fact, the Union attempted to keep her quiet instead. Union representative, "Johnny" told her that she needs to respect the supervisor and he could fire you right now if you complain.

79. David told her that these individuals do not like working with her because she did not speak to them.

80. The Union failed to represent her and did nothing to address this hostile work environment, harassment, or retaliation.

81. The work environment just got increasingly worse and more hostile.

**Retaliation**

82. After her complaints and the meeting with Human Resources, PLAINTIFF'S situation worsened.

83. Rosendo, her supervisor, stepped up his harassment upon discovering that PLAINTIFF had complained to Human Resources. PLAINTIFF viewed this as retaliation for making a complaint.

84. Rosendo suddenly began picking at her work performance.

85. Rosendo harassed her about, among other things, the number of times PLAINTIFF used the bathroom during her shifts. Rosendo used his authority over her to prevent PLAINTIFF from using the bathroom.

86. Rosendo only started to create and enforce these rules *after* PLAINTIFF had made complaints to Mariebelle and the Union.

87. David, the shop steward, and Rosendo told PLAINTIFF that in order for her to leave her station to go to the bathroom, PLAINTIFF had to ask her supervisors, operator, shipping, and her co-workers (at least 5 people) before PLAINTIFF could go to the bathroom.  No other employee had to jump through hoops to go to the bathroom.

88. One day, after sharing her complaints, PLAINTIFF had to go to the bathroom often due to personal reasons.  Rosendo was getting upset with her, but PLAINTIFF could not help using the bathroom because was not feeling well and because PLAINTIFF had her period

during that time.  Around 11:30 a.m., PLAINTIFF went to the bathroom and it took her a little longer since PLAINTIFF had to change her tampon and had heavy bleeding.

89. Rosendo enforced a new rule that PLAINTIFF could not use the bathroom for at least thirty minutes after her break.  No one else was subjected this rule.

90. Rosendo came up to PLAINTIFF yelling and called Tim over.  Tim said to write her up before taking her upstairs to MR. GOLDBERG'S.  He ignored Tim.

91. Rosendo took PLAINTIFF to MR. GOLDBERG'S office and yelled at her and chastised her for using the bathroom too frequently. Rosendo lied because PLAINTIFF did not use the bathroom too frequently. He took this as an opportunity to harass her and embarrass her.

92. After lunch, PLAINTIFF was sent back by Rosendo to MR. GOLDBERG'S office. They called David and Brian from the Union to listen to the conversation. Mariebelle  was there to translate.

93. Rosendo told everyone that PLAINTIFF was breaking every rule.  They were naming Company rules and falsely accused her of breaking rules and not doing her job. PLAINTIFF never had any complaints about breaking rules or not performing her job before engaging in protected activity.

94. PLAINTIFF said that PLAINTIFF did not break any rules and PLAINTIFF just went to the bathroom. PLAINTIFF was so upset that her voice was cracking. PLAINTIFF said that other employees take 45 minutes to use the bathroom but they do not get in trouble but with her, she gets yelled at and chastised for using the bathroom for brief time periods.

95. PLAINTIFF turned to Mariebelle and told her that Rosendo is just doing all this because PLAINTIFF did not want to date him. Rosendo signaled to Mariebelle to not translate that portion of the conversation so Mariebelle did not translate.

96. DEFENDANT GOLDBERG said if PLAINTIFF follows the rules, there would be no problem.

97. However, PLAINTIFF always followed the rules.

98. PLAINTIFF was at a complete disadvantage as the translator/Human Resources, Union, her supervisor and MR. GOLDBERG all attacked her for simply going to the bathroom. It was abundantly clear everyone was upset with her for complaining.

99. There is another Shop Steward named Danny. PLAINTIFF asked Danny if he heard about her complaints and he said yes. He told PLAINTIFF that he wants to give her some advice: "at the end of the day, you are just a number that they can replace. Rosendo is a supervisor and they are going to believe him over you." PLAINTIFF thought Danny would at least support her but he also did not.

100.     PLAINTIFF felt she had no support, no outlet, no help.

**Emotional Damages**

101.     As the harassment continued, PLAINTIFF felt more and more sick. PLAINTIFF would cry all day and was very depressed.

102.     On or about July 8, 2020, PLAINTIFF went to Urgent Care in Middletown. PLAINTIFF told the physician what was happening at work and that PLAINTIFF was suffering from extreme anxiety and fatigue.

103.     Her doctor advised that PLAINTIFF take two weeks off work and provided her a medical leave notice. He also prescribed her medication for anxiety.

104.     PLAINTIFF submitted the medical leave notice to PCG and stayed home for two

weeks as her doctor had suggested. PLAINTIFF gave the letter to Mariebelle in person.

Mariebelle said she would tell MR. GOLDBERG.

105.     PLAINTIFF was never advised of her right to take FMLA leave or other forms of

leave. Her employer never objected to her time off.

**Further Retaliation**

106.     On or about July 26, 2020, when PLAINTIFF returned to work after the two weeks,

PLAINTIFF went to MR. GOLDBERG'S office to inform him that she had returned to

work.

107.     Aware that the DEFENDANTS have done nothing to help, PLAINTIFF began

recording these encounters.

108.     Instead of welcoming her back or asking how PLAINTIFF felt, MR. GOLDBERG

informed her that she had been terminated. He stated that PCG had mailed a letter notifying

her of her termination. PLAINTIFF never received said letter.

109.     MR. GOLDBERG stated that he had terminated her because PLAINTIFF "just

couldn't take two weeks off and return to work." However, PLAINTIFF did submit her

doctor's note so this was not true.

110.     MR. GOLDBERG stated there was no reason PLAINTIFF should have been out of

work for two weeks and that PCG needed more information.

111.     He told PLAINTIFF that the union contract requires that if the leave is more than

three days, they need more information so her note is not sufficient.

112.    Mariebelle falsely stated that she tried to call PLAINTIF several times while out on leave but she only called PLAINTIFF once. Up until now, no one from PCG stated PLAINTIFF'S request needed further substantiation.

113.    PLAINTIFF tried reminding MR. GOLDBERG about the bullying but he denied that any supervisors bullied her; this without any investigation. He was dismissive of her claims.

114.    MR. GOLDBERG failed to conduct any real investigation concerning PLAINTIFF'S complaints, her retaliation claims, and/or the fact that she requested leave due to the perpetual harassment, discrimination, and retaliation she faced.

115.    Eventually, MR. GOLDBERG did admit that he was aware of the derogatory rumors about PLAINTIFF and that she had made numerous complaints.

116.    MR. GOLDBERGG said he would call the Director of Human Resources and spoke to "Kathy," who is located in New Jersey, and informed her of the situation and the reason for her termination. PLAINTIFF was told to come back to work the next day to speak to Kathy. Kathy Steinbaum ("Ms. Steinbaum") is PCG's Human Resource Director.

117.    The next day, Ms. Steinbaum traveled to the New York office and reinstated Plaintiff.  PLAINTIFF told Ms. Steinbaum everything that had happened. She told PLAINTIFF that she was going investigate the situation; a situation which have already been investigated.

118.    Despite her reinstatement, the harassment continued.

119.    Human Resources, the President of the Company and even Ms. Steinbaum from the New Jersey office did nothing to address PLAINTIFF'S complaints. Instead, her co-workers continued to harass her and the hostile work environment just got worse.

120.     Less than a week after her reinstatement, on or about July 27, 2020, PLAINTIFF
went to the bathroom and Chavez went into the bathroom after her. After using the
bathroom, Chavez ran out and falsely accused PLAINTIFF of hitting her and pretended to
cry. MR GOLDBERG was called upstairs to the office and chastised PLAINTIFF, stating
that this was the second time she was brought to his office to be disciplined. MR.
GOLDBERG told PLAINTIFF that he believed Chavez's version of events that
PLAINTIFF hit her. He stated his conviction without any investigation.

121.     The cursing, derogatory hand gestures and harassment occurred on a daily basis.

122.     Ramirez stood up for PLAINTIFF and then co-workers began harassing him.

123.     PLAINTIFF could not handle all of the rumors and constant harassment anymore.
PLAINTIFF felt that her only option was to leave since her employer, and Union, were
doing nothing to address the situation.

124.     On or about August 25, 2020, during a meeting with MR. GOLDBERG, Dave,
Mariebelle and PLAINTIFF, MR. GOLDBERF accused PLAINTIFF of touching another
employee- this without any investigation or even asking her side of the story. In fact, he
told her that he did not believe PLAINTIFF'S denials.

125.     During this same meeting, PLAINTIFF was scolded and threatened for allegedly
raising a finger at MR. GOLDBERG. He told her that if she raises her finger at him again,
they are going "to have bigger problems." This was not a meeting, not an investigation but
another opportunity to threaten, intimidate, harass, and retaliate against PLAINTIFF.

126.     After taking about a ten minute break, the meeting resumed and while
DEFENDANT, MR. GOLDBERG was calmer, when PLAINTIFF stated again that she

feels like she was discriminated against because she is the minority among a majority, DEFENDANT Goldberg responded "No, that's not true."

127.    On or about August 26, 2020, another meeting was held with the Union, PLAINTIFF, Mariebelle, Dave and Mitzi Chavez.

128.    At this meeting, PLAINTIFF asked MR. GOLDBERG to call the police. He asked her if she wants to file a police complaint. She clearly said "yes".

129.    PLAINTIFF was sent to the training room where she is made to believe the police will be coming to take a statement from her.

130.    Instead, PLAINTIFF is called back to the meeting room and told that she and Ms. Chavez simply do not get along and should "bury how you feel because you have to work together." She is told that if they cannot "forgive and forget," that there is a possibility that she will no longer work at PCG. This is further evidence of the fact that an employee who complains about workplace harassment is met with threats of losing her job.

131.    PLAINTIFF was told that she needs to "focus on work" and that this workplace "is not a day care. It is not a school. You have to ignore it. You're angry."

132.    DEFENDANT, MR. GOLDBERG told PLAINTIFF that she has been in his office two times.  PLAINTIFF reminded him that the reason she was there was because she complained.  He continued to discredit her and chastise her by stating "No. this is not a school."

133.    MR. GOLDBERG told PLAINTIFF she is "hearing and seeing things that are bothering you. There is nothing to say."

134.    PLAINTIFF, frustrated that she is not getting the help she needs, asked for the police to be called again and states that she wants a restraining order. Instead, she was sent out of the room.

135.    Subsequently, Kathy and Mairebelle met with PLAINTIFF.

136.    Ms. Steinbaum refused to hear PLAINTIFF complaints; rather she specifically told Plaintiff that she does not want to hear about past events.

137.    Ms. Steinbaum stated that this is the second time where there is some sort of conflict with PLAINTIFF and someone at work.

138.    Ms. Steinbaum was incorrect; PLAINTIFF has complained a few times prior to this time period **because she was being harassed**.

139.    Ms. Steinbaum states "when you constantly have one person who is constantly involved in some sort of workplace conflict and the same person whose being involved, there is a common thread. You need to think about how you're acting and reacting in the workplace because if this continues, it's going to be a problem."    The victim and complainant of the workplace harassment is being told by the Director of Human Resources that she is essentially a trouble -maker and this all must be her fault.

140.    When PLAINTIFF attempt to remind Ms. Steinbaum of the fact that she previously complained about Chavez harassing her and that this false accusation is a result of her complaints, Ms. Steinbaum asks "complained about what?" Either the Director of Human Resources was not aware of the few complaints made over the past month and a half or she simply ignored them.

141.     Ms. Steinbaum, while attempting to pretend not to have knowledge of PLAINTIFF prior complaints, refers back to them by stating: "…just because she is in a corner laughing, it does not mean that they are laughing about you. People laugh at the workplace….nothing makes sense. What is the issue? Why would Misty want revenge on you? Just because she is having a conversation and laughing and standing right there and making gestures and pointing at you does not mean it's about you."

142.     Ms. Steinbaum continues this "investigation" by berating PLAINTIFF making comments like: "You realize that you're here because you're in trouble. This is not a soap opera. This is not a TV drama show. I don't care about the Columbian outside of work. I care about a conversation you had with the Columbian outside of work and who said what to who."

143.     Ms. Steinbaum told PLAINTIFF that she "needs to put blinders on and get over the past and understand that there is workplace civility and everyone deserves to come to work without feeling threatened, without feeling scared, without feeling uh any kind of uh situation exists that puts them in an uncomfortable situation. Everyone deserves to be treated with respect and if you can't do that in the workplace, then we have to have a whole other conversation."

144.     PLAINTIFF agrees that an employee should be treated with respect and be free from a hostile work environment.  And yet, she was not afforded these same protections. s

145.     Even more shocking is Ms. Steinbaum's attempt to discredit PLAINTIFF's side of the story stating that what PLAINTIFF says does not match what she saw in the video. However, in the recording she admits that there is actually **no** video inside the bathroom.

146.     Ms. Steinbaum made a biased decision on what she thinks occurred.

147.     PLAINTIFF was discriminated against, harassed, denied proper FMLA notice, and retaliated against while employed by DEFENDANTS. She was subjected to a hostile work environment.

148.     PLAINTIFF was constructively discharged by DEFENDANTS on or about August 30, 2020.

149.     Her doctor referred her to a psychologist because PLAINTIFF was having trouble sleeping as a result of the rumors and harassment.

## AS A FIRST CAUSE OF ACTION

### Title VII- Sexual Harassment

150.     PLAINTIFF repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as though fully set forth herein.

151.     The DEFENDANTS intentionally discriminated against PLAINTIFF by creating and maintaining a sexually hostile work environment in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. §2000e et seq.

152.     The sexually hostile work environment created by the DEFENDANTS was severe, pervasive and part of a pattern or practice of harassment against PLAINTIFF.

153.     The hostile work environment altered the PLAINTIFF's conditions of employment by creating an abusive, physically threatening, humiliating, and intolerable working environment.

154.     PLAINTIFF made numerous attempts to complain about the sexual harassment she was subjected to, but DEFENANTS took no action to stop the sex-based, offensive, unwelcomed, unsolicited, and illegal behavior directed towards PLAINTFF.

155.     The CORPORATE DEFENDANTS, through and together with the

INDIVIDUAL DEFENDANTS participated in the conduct giving rise to the harassment

and hostile work environment that altered the terms and conditions of PLAINTIFF's

employment.

156.     As a direct and proximate consequence of the DEFENDANTS' intentional,

unlawful, discriminatory treatment of PLAINTIFF, she has suffered and continues to

suffer damages including, but not limited to, compensatory damages due to emotional

distress and mental anguish.

157.     By reason of the sexual harassment perpetuated by the DEFENDANTS, the

PLAINTIFF is entitled to all damages available to her under Title VII.

### AS A SECOND CAUSE OF ACTION

**Title VII- Discrimination**

158.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the

above paragraphs of this Complaint as if more fully set forth herein at length.

159.     This claim is authorized and instituted pursuant to the provisions of Title VII of the

Civil Rights Act of 1964; 42 U.S.C. Section(s) 2000e et Seq., as amended, for relief based

upon the unlawful employment practices of the above-named Defendants. Plaintiff

complains of Defendants' violation of Title VII's prohibition against discrimination in

employment based, in whole or in part, upon an employee's sex and national origin.

160.     Defendants engaged in unlawful employment practices prohibited by 42 U.S.C.

§2000e et seq., by discriminating against Plaintiff because of her sex and national origin,

together with retaliation and constructive discharge.

## AS A THIRD CAUSE OF ACTION

### New York State Human Rights Law – Sexual Harassment

161.    PLAINTIFF repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as though fully set forth herein.

162.    NYSHRL (Executive Law §296) provides that it shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

163.    DEFENDANTS engaged in an unlawful discriminatory practice in violation of NYSHRL (Executive Law §296) by actively and constructively taking adverse employment actions, creating and maintaining a sexually hostile work environment and discriminatory working conditions, and otherwise discriminating against the PLAINTIFF because of her sex and gender.

164.    DEFENDANTS engaged in an unlawful discriminatory practice by taking adverse employment action and otherwise discriminating against the PLAINTIFF by engaging in quid pro quo sexual harassment.

165.    The hostile work environment created by DEFENDANTS was severe and pervasive.

166.     The hostile work environment altered the PLAINTIFFS' conditions of employment by creating an abusive, threatening, humiliating, and intolerable working environment.

167.     PLAINTIFF complained about the sexual harassment she was subjected to, and removed herself from the abusive environment she found herself in.

168.     DEFENDANTS took no action to stop the sex-based, offensive, unwelcomed, unsolicited, and illegal behavior that was directed towards PLAINTIFF.

169.     INDIVIDUAL DEFENDANT had the power to hire, fire, and alter the terms and working conditions of PLAINTIFF' employment.

170.     The CORPORTATE DEFENDANTS, through and together with the INDIVIDUAL DEFENANTS, altered the terms and conditions of PLAINTIFF's employment.

171.     DEFENDANTS failed to promptly investigate or take appropriate remedial measures despite being informed about the existence of discriminatory conduct.

172.     That as a direct result of the foregoing, the PLAINTIFF is entitled to all damages available to them under New York State Human Rights Law.


## AS A FOURTH CAUSE OF ACTION

### New York State Human Rights Law – Sexual Harassment

173.     Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

174.     Executive Law §296 provides that, "1. It shall be an unlawful discriminatory practice: '(a) For an employer or licensing agency, because of an individual's . . .national origin…..sex. . . to refuse to hire or employ or to bar or to discharge from employment such

individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.'"

175.     Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her sex and national origin, together with retaliation and constructive discharge

## AS A FIFTH CAUSE OF ACTION

### Title VII – Retaliation

176.     PLAINTIFF repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as fully set forth herein.

177.     PLAINTIFF complained about the sexually hostile working environment to which she was subjected to.

178.     DEFENDANTS retaliated against PLAINTIFF for engaging in protected activity of reporting and opposing the sexually hostile work environment to which she was being subjected to.

179.     DEFENDANTS threatened to terminate her employment if she did show up to work, despite the fact that she was seeking medical treatment.

180.     As a direct and proximate consequence of the DEFENDANTS' intentional, unlawful, discriminatory and retaliatory treatment of PLAINTIFF has suffered and continues to suffer damages, including but not limited to, compensatory damages due to emotional distress and mental anguish.

181.    PLAINTIFF is entitled to damages available under Title VII for the retaliation she endured.

## AS A SIXTH CAUSE OF ACTION

### New York State Human Rights Law - Retaliation

182.    PLAINTIFF repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as though fully set forth herein.

183.    PLAINTIFF complained about the sexually hostile working environment to which she was subjected to.

184.    DEFENDANTS engaged in an unlawful and retaliatory practice in violation of the NYSHRL by taking adverse employment action and otherwise discriminating and retaliating against the PLAINTIFF.

185.    DEFENDANTS gave PLAINTIFF an ultimatum to return to work, without a proper investigation or ensuring that her complaints were addressed and that she would be afforded a safe work environment.  DEFENDANTS threatened to terminate her employment if she did show up to work, despite the fact that she was seeking medical treatment.

186.    DEFENDANTS retaliated against PLAINTIFF for engaging in protected activities for reporting and opposing the sexually hostile working environment to which she was being subjected.

187.     In violation of New York Executive Law § 296, DEFENDANTS retaliated against the PLAINTIFF in a way that interfered with the terms and conditions of PLAINTIFF's employment.

188.     As a direct and proximate cause of DEFENDANTS' intentional, unlawful, discriminatory, and retaliatory treatment of PLAINTIFF suffers and continues to suffer damages, including but not limited to, compensatory damages due to emotional distress and mental anguish.

189.     By reason of the retaliation perpetrated by DEFENDANTS, PLAINTIFF is entitled to all damages available to them under New York State Human Rights law.

## AS A SEVENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

190.     PLAINTIFF repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as though fully set forth herein DEFENDANTS engaged in extreme and outrageous conduct.

191.     DEFENDANTS intended to cause, or disregarded a substantial probability of causing, severe emotional distress to PLAINTIFF.

192.     There exists a causal connection between the above conduct and said injury.

193.     As a result of said conduct PLAINTIFF suffered and suffers from severe emotional distress.

## AS A EIGHT CAUSE OF ACTION

### Negligent Hiring, Supervision & Retention

194.     PLAINTIFF repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as though fully set forth herein.

195.     As a result of DEFENDANTS gross negligence, PLAINTFF experienced, *inter alia,* sexual harassment, retaliation, physical harm, anxiety, and emotional distress.

196.     Had DEFENDANTS taken reasonable care in making decisions concerning hiring, supervision and retention of those who harassed PLAINTIFF, PLAINTIFF could have been spared the foreseeable harm she experienced.

197.     DEFENDANTS should have known or knew of the harassers' improper behavior and should have afforded PLAINTIFF an opportunity to complain without being constantly and consistently ignored.

198.     As a direct and proximate result of the aforementioned conduct, perpetuated by DEFENDANTS, PLAINTFF was damaged and suffered physical and emotional harm, anguish, anxiety and humiliation that continues today.

199.     By reason of DEFENDANT's failure to exercise due care in hiring supervision, and retention of employees, PLAINTFF suffered sexual harassment and retaliation.

## AS A NINTH CAUSE OF ACTION

### Constructive Discharge

200.     PLAINTIFF repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as though full set forth herein,

201.     PLAINTIFF was constructively discharged based on her sex when she was subjected to DEFENDANTS' sexual harassment and hostile working environment and retaliation.

202.    Despite DEFENDANTS knowing that PLAINTIFF had complained and requested time off, DEFENDANTS demanded that PLAINTIFF return to work or else be terminated.

203.    The working conditions resulting from DEFENDANTS' sexual harassment/hostile working environment and retaliation were so intolerable that a reasonable person in the respective employee's situation, such as the PLAINTIFF, would have been compelled to resign.

204.    As a direct and proximate consequence of the DEFENDANTS' intentional, unlawful, discriminatory, and retaliatory treatment, which led to the constructive discharge of the PLAINTIFF, the PLAINTIFF has suffered and continues to suffer damages, including but not limited to, compensatory damages due to emotional distress and mental anguish.

205.    By reason of the retaliation perpetrated by DEFENDANTS, the PLAINTIFF is entitled to damages available under Title VII and New State Human Rights Law.

## AS A TENTH CAUSE OF ACTION

### Family and Medical Leave Act- Interference

206.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

207.    At all times during, and upon information and belief, Plaintiff was an employee within the meaning of 29 U.S.C. §2611 and its associated regulations and eligible employees.

208.    During her employment with DEFENDANTS, PLAINTIFF was eligible for protected FMLA leave due to her health condition.

209.     The DEFENDANTS interfered with PLAINTIFF's rights by failing to provide and/or timely provide, the written notices of her. FMLA rights and responsibilities required by 29 C.F.R. § 825.300(c) and/or written designation notice required by 29 C.F.R. § 825.300(d).

210.     DEFENDANT MR GOLDBERG falsely told PLAINTIFF that "FMLA is for the state not the Company."

211.     DEFENDANTS retaliated against PLAINTIFF by terminating her employment.

212.     PLAINTIFF suffered damages as a result of DEFENDANTS' willful conduct.

213.     PLAINTIFF was eventually reinstated but constructively discharge due to the harassment, discrimination and retaliation she faced.

## PRAYER FOR RELIEF

**WHEREFORE,** upon all of the facts, allegations, and causes of action as set forth and alleged herein, PLAINTIFF respectfully requests that this Court:

A.  Grant judgment against DEFENDANTS as to each and every cause of action herein alleged;

B.  Grant judgment against DEFENDANTS for engaged in unlawful employment practice prohibited by federal, state common law, Title VII, NYSHRL;

C.  Grant judgment against DEFENDANTS for harassing, discriminating against, taking adverse employment actions, and retaliating against PLAINTIFF on the basis of her sex, gender and national origin, and for taking an adverse employment action against PLAINTIFF, and for retaliating against PLAINTIFF on the basis of her sex and gender and hostile work environment;

D.  Awarding damages to the PLAINTIFF for all lost wages, including front pay and back pay, and benefits resulting from DEFENDANTS' unlawful employment practices;

E.  Awarding PLAINTIFF compensatory damages for mental and emotional distress, pain and suffering;

F.  Awarding PLAINTIFF attorney's fees, costs, and expenses; and

G.  Awarding PLAINTIFF such other and further relief as the Court may deem equitable, just and proper to remedy the DEFENDANTS' unlawful employment practices.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury as to all issues so triable.


Dated: Melville, New York
~~October~~ 7, 2021
December

Respectfully Submitted,

**Pervez & Rehman, P.C.**
Attorneys for PLAINTIFF

_____/s/ Aneeba Rehman_____
Aneeba Rehman, Esq.
68 South Service Road, Suite 100
Melville, NY 11747
(631) 427-0700
arehman@pervezrehman.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

WENDY CAROLINA CANALES HUETE

                                           VERIFIED
                                           COMPLAINT

                 PLAINTIFF,

                                          No:

        -against-

                                           Jury Trial Demanded

PRESIDENT CONTAINER GROUP II, LLC and RICHARD
GOLDBERG

                 DEFENDANTS.

      -------------------------------------------------------------------------X

**VERIFICATION**

STATE OF NEW YORK         )
                              ss.:
COUNTY OF Suffolk. )

I, WENDY CAROLINA CANALES HUETE , am the Plaintiff in the within action for.
PLAINTIFF have read the foregoing Complaint and know the contents thereof. The contents are
true to her own knowledge except as to matters therein stated to be alleged upon information and
belief, and as to those matters PLAINTIFF believe them to be true.

                                        WENDY CAROLINA CANALES HUETE

Sworn to before me on this  1ᵗʰ  day
of December, 2021.

_____
         Notary Public

ANEEBA REHMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02RE6299943
Qualified in Nassau County
Commission Expires March 31, 2022